Fred Norton (SBN 224725)
Bree Hann (SBN 215695)
Matthew W. Turetzky (SBN 280997)
THE NORTON LAW FIRM PC
299 Third Street, Ste 106
Oakland, California 94607
Telephone: (510) 906-4900
Fax: (510) 906-4910
fnorton@nortonlaw.com
bhann@nortonlaw.com
mturetzky@nortonlaw.com

*Attorneys for Plaintiff*
TESLA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| TESLA, INC., a Delaware corporation,<br><br>  *Plaintiff*,<br><br>v.<br><br>GUANGZHI CAO, an individual,<br><br>  *Defendant*. | Case No.  19-cv-01463-VC<br><br>**DECLARATION OF MATTHEW TURETZKY IN SUPPORT OF TESLA, INC.'S OPPOSITION TO XMOTORS.AI, INC.'S MOTION TO QUASH AND IN SUPPORT OF TESLA, INC.'S MOTION TO COMPEL RE ZHANG SUBPOENA** |

# DECLARATION OF MATTHEW TURETZKY

I, Matthew Turetzky, declare as follows:

1. I am an attorney licensed to practice law in California. I am a senior associate at The Norton Law Firm PC, counsel of record for Plaintiff Tesla, Inc ("Tesla"). Except where otherwise stated, the statements in this declaration are based on my own personal knowledge and, if called to do so, I could and would testify competently to them.

**Cao's Pre-Discovery Certification Regarding His Electronic Devices**

2. Tesla filed this lawsuit against Defendant Guangzhi Cao ("Cao") on March 21, 2019.

3. Shortly thereafter, on or about April 5, 2019, Cao provided Tesla a signed affidavit titled Certification By Guangzhi Cao Regarding Electronic Data Sources ("Cao's Certification"). A true and correct copy of Cao's Certification is attached as **Exhibit 1.**

**XMotors' Participation In The Protective Order**

4. Non-party XMotors.ai, Inc. ("XMotors") participated in negotiations with Tesla and Cao about the Stipulated Protective Order (ECF No. 22) at the outset of this case.

5. On May 22, 2019, I sent an email to Scott Raber and Zheng Liu of Rimon Law, counsel to XMotors, a copy of a draft Protective Order agreed to by Tesla and Cao. On May 24, 2019, Ms. Liu responded by email that XMotors "[doesn't] want [to] hold anything up" and if the "parties are comfortable with" the Protective Order, they had XMotors' approval to "go ahead and file it." On June 3, 2019, Ms. Liu and Mr. Raber sent me an email stating they "have no significant concerns relating to the Protective Order." A true and correct copy of this email exchange is attached as **Exhibit 2**.

**XMotors' Document Productions**

6. During mid-to-late 2019, XMotors produced to Tesla certain documents and a forensic image of Cao's XMotors-issued laptop. XMotors produced these materials in response to Tesla's informal request for documents and Tesla's first document subpoena to XMotors. I have reviewed many of these documents and understand the parameters of

XMotors' document collection and production based on that review and my colleagues' meet and confer discussions with Ms. Liu and Mr. Raber over the last several months.

7. XMotors' document productions were incomplete in several respects.

8. First, XMotors limited its productions to communications directly with Cao, and excluded other internal communications about him, even if those communications referred to both Cao and Tesla, Cao and a thumb drive, or Cao and trade secrets.

9. Second, XMotors claimed that it could not provide certain messages Cao and his XMotors colleagues exchanged using DingTalk. In an email dated August 19, 2019, Mr. Raber wrote that those communications exist on a server "not run by XMotors or Xiaopeng." A true and correct copy of Mr. Raber's August 19, 2019 email to me is attached as **Exhibit 3**.

10. Third, XMotors' productions did not include any XMotors source code other than the single iteration that existed on Cao's work laptop.

11. XMotors has also made a small production in response to Tesla's second subpoena. The second subpoena is the subject of XMotors' motion to quash.

12. To date, XMotors has produced a total of 4,864 emails including any attachments; 148 DingTalk messages, 12 WeChat messages, and 54 standalone documents, as well as a forensic image of the work computer assigned to Cao.

13. In an email to me dated December 22, 2019, Mr. Raber stated XMotors would provide a privilege log no later than December 27, 2019. To date, XMotors has not provided a privilege log to Tesla. A true and correct copy of Mr. Raber's December 22, 2019 email to me is attached as **Exhibit 4**.

**Cao's Deposition**

14. On January 7, 2020, I attended the deposition of Cao. On February 14, 2020, Cao's attorney, Gabriela Kipnis, submitted Cao's corrections to the transcript. A true and correct copy of excerpts of Cao's deposition transcript and Cao's corrections to the transcript is attached to this declaration as **Exhibit 5**.

**Meet and Confer Efforts**

15. Following Cao's deposition, Tesla met and conferred with Cao and XMotors starting on January 14, 2020 to discuss Tesla's need for additional discovery. I personally participated in Tesla's meet and confer discussions with Cao and XMotors.

16. On January 14, 2020, my co-counsel Fred Norton spoke to Cao's counsel, Mark Conrad. Mr. Norton explained Tesla would seek additional discovery from XMotors in light of the forensic evidence that contradicted Cao's assertions at his deposition, then proposed additional areas of discovery that Tesla would need. Mr. Norton explained that Tesla would serve a document and deposition subpoena on XMotors, but would simultaneously propose a compromise to XMotors that involved the use of MD5 hash comparisons. Mr. Conrad requested that Tesla memorialize its proposal in writing, which Mr. Norton agreed to do.

17. On January 16, 2020, Mr. Norton copied me on an email he sent to Mr. Conrad. Mr. Norton's email explained Tesla's intent to serve a second document subpoena on XMotors. A true and correct copy of Mr. Norton's January 16, 2020 email to Mr. Conrad is attached as **Exhibit 6**.

18. On January 17, 2020, I served document and deposition subpoenas on XMotors on behalf of Tesla by emailing a copy of the subpoenas to Ms. Liu and Mr. Raber.

19. Later that day, Mr. Raber confirmed he would accept service of the subpoenas by email. A true and correct copy of my email to Ms. Liu and Mr. Raber and the subpoenas are attached as **Exhibit 7**.

20. After I served the subpoenas on XMotors, counsel for Tesla, Cao, and XMotors met and conferred again regarding several issues. Tesla agreed to provide certain information to XMotors to convey Tesla's need for the information sought by Tesla's subpoena.

21. ***First***, Cao had requested and Tesla agreed to provide Cao a summary of the forensic data that Tesla discussed with Cao at his deposition. This forensic data described

1  Tesla's basis for its allegations against Cao concerning Cao's downloading, transfer,
2  retention, and disclosure of Tesla's Autopilot source code.

3    22. On January 29, 2020, Mr. Norton copied me on an email he sent to Mr.
4  Conrad.  Mr. Norton's email summarized the forensic data that Tesla discussed with Cao
5  at his deposition concerning the downloading, transfer, retention, and disclosure of Tesla's
6  Autopilot source code.  Mr. Conrad indicated he would provide Mr. Norton's January 29,
7  2020 email to XMotors.  A true and correct copy of Mr. Norton's January 29, 2020 email
8  to Mr. Conrad is attached as **Exhibit 8.**

9    23. *Second*, on January 28, 2020, Tesla amended its responses to Cao's first set
10 of interrogatories, among other things, to expressly state Tesla was alleging Cao
11 "wrongfully disclos[ed] TESLA TRADE SECRETS to XMotors."  A true and correct
12 copy of excerpts of Tesla's Third Supplemental Interrogatory Responses is attached as
13 **Exhibit 9**.

14   24. *Third*, Cao requested and Tesla agreed that XMotors could review Cao's
15 deposition transcript, except for testimony designated by Tesla as "Highly Confidential –
16 Attorneys' Eyes Only."  On February 12, 2020, Ms. Kipnis, Cao's co-counsel, emailed me
17 asking to confirm that she could share non-AEO testimony with XMotors.  On behalf of
18 Tesla, I indicated that she could.  A true and correct copy of my February 12, 2020 email
19 to Ms. Kipnis confirming that she could share Cao's deposition transcript with XMotors is
20 attached as **Exhibit 10.**

21   25. At some point during this meet and confer process (after January 16, 2020
22 but before XMotors filed its motion to quash), I had participated in a meet and confer call
23 with Mr. Conrad, at which time he indicated that he had forensic information showing that
24 the SanDisk Cruzer attached to Cao's XMotors laptop was different from the SanDisk
25 Cruzer that Cao had connected to his personal iMac.  Mr. Norton asked Mr. Conrad to
26 explain or produce that information, and Mr. Conrad declined.

27   26. On January 16, 2020, at the outset of this meet and confer, and while
28 maintaining its right to all the information sought by subpoena, Tesla proposed a

compromise without waiting for any objection by XMotors. *See* **Exhibit 6**. The compromise was a process by which a third-party neutral expert would be retained to search for MD5 hash matches and "fuzzy hash" matches between Tesla's source code and the source code files in XMotors' source code repository and on the devices assigned to specific employees who interviewed or worked with Cao. Tesla also proposed the parties engage the third-party neutral before proceeding to the other subpoena topics. If the comparison of Tesla's source code returned no matches, then Tesla would withdraw its other subpoena requests. Although the tendency of this process to produce false negatives would be prejudicial to Tesla, Tesla was willing to propose it to expedite the discovery process and mitigate any legitimate XMotors concerns over production of source code, and because XMotors' willingness to proceed, even on that limited basis, would be some indication that XMotors was acting in good faith and had little to hide.

27. XMotors and Tesla met and conferred extensively over several weeks while Tesla granted repeated extensions for XMotors to object or respond to the subpoena. XMotors, however, limited the scope of the proposal in ways that significantly undermined it. For instance, XMotors proposed excluding from the comparison set "common" or "open source" files in the Tesla source code, as well as data files. XMotors also rejected producing any information from the computers of the Xiaopeng executives who interviewed Cao in China. Tesla also assured XMotors that, to the extent Tesla was seeking testimony about XMotors' source code in Topics 1 and 2 of the Rule 30(b)(6) notice, it was not seeking information about the substance of that code.

28. After extensive back and forth, XMotors declared an impasse and served its objections on March 6, 2020. The parties met and conferred on the remaining items on March 19, 2020. On March 27, 2020, Mr. Raber sent me and my colleagues an email asking for another meet and confer call that day, to which my colleagues and I agreed. Mr. Raber then asked that my colleagues and I agree to postpone the meet and confer until March 30, 2020. My colleague, Mr. Norton, indicated he would provide Tesla's availability for a call on March 30, 2020.

1    29.    On March 30, 2020, Mr. Raber informed me and my colleagues that XMotors does not "believe there is much more to discuss regarding the subpoenas." Given the "apparent impasse," Mr. Raber stated that XMotors would file a motion to quash later that day, which it did. A true and correct copy of Mr. Raber's March 27-30, 2020 exchange with me, Mr. Norton, and our co-counsel, is attached as **Exhibit 11**.

**Cao's iPhone 6 Plus**

30.    While XMotors was meeting and conferring with Tesla regarding the document and deposition subpoenas, Tesla was proceeding to conduct further analysis on various devices listed in Cao's Certification. One of these devices was Cao's iPhone 6 Plus.

31.    The phone is severely damaged. When Tesla's e-discovery vendor representative, Katherine Delude of Consilio, first took custody of the device from Cao, she sent me an email attaching photographs of the iPhone 6 Plus, which showed extensive physical damage. A true and correct copy of Ms. Delude's April 25, 2019 email to me and Ms. Delude's photographs of Cao's iPhone 6 Plus is attached as **Exhibit 12**.

32.    After this initial review, Tesla's forensic consultants were concerned the damaged iPhone 6 Plus could not be analyzed without risking loss of data. Tesla therefore returned the phone to Cao for the time being. On June 3, 2019, I emailed Mr. Conrad, indicating that Tesla "could return the phone so long as you continue to preserve it until this matter is resolved." Mr. Conrad agreed, responding that same day. A true and correct copy of my June 3, 2019 email to Mr. Conrad and his response is attached as **Exhibit 13**.

33.    But after Cao's deposition, I notified Mr. Conrad that Tesla wished to examine the device further. On February 10, 2020 at 12:16PM, Mr. Conrad emailed me stating the "device can be picked up at TransPerfect's office." A true and correct copy of his February 10, 2020 email to me is attached as **Exhibit 14**.

34.    On February 11, 2020, Daniel Angotti from TransPerfect sent me an email indicating that the iPhone 6 Plus had been provided to David Farnham from Redacted,

Inc., Tesla's forensic analysts. A true and correct copy of Daniel Angotti's February 11, 2020 email to me is attached as **Exhibit 15**.

35. On March 1, 2020, I notified Mr. Conrad that Tesla would initialize the device and he responded that same day indicating Cao had no objection. A true and correct copy of Mr. Conrad's March 1, 2020 email to me indicating Cao did not object to Redacted initializing Cao's iPhone is attached as **Exhibit 16**.

36. On March 4, 2020, Mr. Farnham informed me he had identified an .obliterated file on the broken iPhone. The .obliterated file, Mr. Farnham explained, indicates that someone reset the phone and permanently deleted all files on the device. The .obliterated file had a timestamp of February 10, 2020 at 1:09PM Pacific Time.

37. I contacted Mr. Conrad to ask about the reset and deletion. He explained that after hearing Tesla's renewed request for the device, he was curious what the device might show and asked Cao's e-discovery vendor, TransPerfect, to see what could be recovered, with the express direction that TransPerfect should not alter the device. Nonetheless, he stated, on February 10, 2020, TransPerfect reset the iPhone before giving it to Tesla.

**News Articles About XMotors**

38. On April 12, 2020, I visited a webpage with the URL https://qz.com/1362926/chinese-ev-unicorn-xpeng-motors-wouldnt-exist-without-tesla/. This URL led to an August 20, 2018 article by Echo Huang for Quartz titled "This Chinese electric vehicle maker is copying Tesla—and proud of it." A true and correct copy of this article is attached as **Exhibit 17**.

39. On April 12, 2020, I visited a webpage with the URL https://electrek.co/2019/04/16/tesla-clone-xpeng-electric-sedan/. This URL led to an April 16, 2019 article by Fred Lambert for Elektrek titled "'Tesla-clone' Xpeng unveils new electric sedan with over 300 miles of range." A true and correct copy of this article is attached as **Exhibit 18**.

40. On April 12, 2020, I visited a webpage with the URL https://electrek.co/2017/10/24/tesla-clone-chinese-ev-startup-all-electric-suv-open-source-patent/. This URL led to an October 24, 2017 article by Fred Lambert for Elektrek titled "Tesla-inspired Chinese EV startup launches all-electric SUV using open-source patents." A true and correct copy of this article is attached as **Exhibit 19**.

41. On April 12, 2020, I visited a webpage with the URL https://www.theverge.com/2018/7/10/17556034/fbi-apple-trade-secrets-xpeng-self-driving. This URL led to a July 10, 2018 article by Sean O'Kane for The Verge titled "FBI charges former Apple employee with stealing trade secrets from self-driving car project." A true and correct copy of this article is attached as **Exhibit 20**.

**Text Messages**

42. In 2019, Tesla employee Jacob Nocon provided me with an Excel spreadsheet containing Cao's iMessages, titled guacao_imessage.xlsx. I understand Mr. Nocon's team created and populated this spreadsheet during its investigation into Cao's activities before leaving Tesla.

43. Also in 2019, I provided Tesla's translation vendor, Morningside IP, with an Excel spreadsheet titled guacao_imessage (Excerpts).xlsx, which included excerpts from the spreadsheet provided to me by Mr. Nocon. I directed Morningside IP to provide a certified translation of the excerpts in the spreadsheet.

44. On or about January 3, 2020, I received a letter from Morningside IP representative Alexander Danesis, which enclosed a translation of the excerpts from the provided spreadsheet and certified that the "translation from Chinese and into English is an accurate representation of the" excerpts. A true and correct copy of Mr. Danesis's letter confirming Morningside IP's accurate translation of the excerpts from Chinese to English is attached as **Exhibit 21**.

45. Attached to Mr. Danesis's letter was an English translation of the iMessages in the spreadsheet guacao_imessage (Excerpts).xlsx. This spreadsheet included 5,739 lines of iMessages or SMS messages. The messages between Cao and Duo Chen on July

10, 2018 through July 12, 2018 and the messages between Cao and his wife on December 16, 2018 are relevant to Tesla's opposition to XMotors' motion to quash.  A true and correct copy of an excerpt of Morningside IP's translation of the spreadsheet guacao_imessage (Excerpts).xlsx, which includes messages exchanged between Cao and Duo Chen on July 10, 2018 through July 12, 2018 and messages exchanged between Cao and his wife on December 16, 2018, is attached as **Exhibit 22**.

### Other Documents

46.     As part of his production to Tesla in this case, Cao produced documents bearing Bates numbers CAO-007509 and CAO-007511.  The documents appear to be dated June 5, 2018 and include an email from Cao to an individual named Yolanda and a calendar invitation from Yolanda to Cao.  A true and correct copy of the documents produced to Tesla by Cao bearing Bates numbers CAO-007509 and CAO-007511 with Cao and Yolanda's email addresses and phone numbers redacted is attached as **Exhibit 23**.

47.     As part of his production to Tesla in this case, Cao produced a document bearing Bates numbers CAO-021523 to CAO-021525.  The document appears to be an email dated November 17, 2018 from Cao to an individual named Chengming "Alex" Ren.  I understand from direct communications I have had with Mr. Ren that the "@talentseer.com" address is Mr. Ren's email address.  A true and correct copy of the document produced to Tesla by Cao bearing Bates numbers CAO-021523 to CAO-021525 with Cao and Mr. Ren's email addresses redacted is attached as **Exhibit 24**.

48.     As part of his production to Tesla in this case, Cao produced a document bearing Bates numbers CAO-025628 to CAO-025630.  The document appears to be a November 10, 2013 Amazon.com receipt for a SanDisk Cruzer USB Thumb Drive addressed for shipping to Cao's wife.  A true and correct copy of the document produced to Tesla by Cao bearing Bates numbers CAO-025628 to CAO-025630 with the shipping address and other confidential information redacted is attached as **Exhibit 25.**

49. On October 15, 2019, Cao responded to Tesla's First Set of Interrogatories in this case. A true and correct copy of Cao's responses to Tesla's First Set of Interrogatories with Cao's address redacted is attached as **Exhibit 26.**

50. On November 19, 2019, Cao responded to Tesla's Second Set of Interrogatories in this case. A true and correct copy of Cao's responses to Tesla's Second Set of Interrogatories with Cao's address redacted is attached as **Exhibit 27.**

51. As part of its production to Tesla in this case, XMotors produced documents to Tesla that included three pages bearing Bates numbers XMotors.WeChat000076, XMotors.WeChat000137, and XMotors.WeChat000138. The documents appear to be excerpts of WeChat messages involving Cao and an individual named Cindy Chen, who appears to have been arranging Cao's interview itinerary for his interview with XMotors executives in China. A true and correct copy of the documents produced to Tesla by XMotors bearing Bates numbers XMotors.WeChat000076, XMotors.WeChat000137, and XMotors.WeChat000138 with an irrelevant third-party's name redacted is attached as **Exhibit 28**.

52. I provided Tesla's translation vendor, Morningside IP, with the pages produced to Tesla by XMotors bearing Bates numbers XMotors.WeChat000076, XMotors.WeChat000137, and XMotors.WeChat000138. I directed Morningside IP to provide a certified translation of those pages, along with several other pages of documents produced by XMotors.

53. On December 20, 2019 and January 6, 2020, I received letters from Morningside IP representative Mr. Danesis, which enclosed a translation of the XMotors documents and certified that the "translation from Chinese and into English is an accurate representation of the" documents. A true and correct copy of Mr. Danesis's letters confirming Morningside IP's accurate translation of the excerpts from Chinese to English is attached as **Exhibit 29**.

54. Attached to Mr. Danesis's letters were English translations of the XMotors documents. These translations included more than just the pages bearing Bates numbers

XMotors.WeChat000076, XMotors.WeChat000137, and XMotors.WeChat000138.  I took the translations of just those pages, saved them into a separate PDF, and have attached those pages to this declaration.  A true and correct copy of Morningside IP's English translation of the pages bearing Bates numbers XMotors.WeChat000076, XMotors.WeChat000137, and XMotors.WeChat000138 with an irrelevant third-party's name redacted is attached as **Exhibit 30**.

      I declare under penalty of perjury under the laws of the United States that the above statements of fact are true and correct and that this declaration was executed on April 13, 2020, in Fremont, California.

Matthew Turetzky